

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

Firebird Republics Fund, Ltd., Firebird Global Master
Fund II, Ltd., Firebird Avrora Fund, Ltd.,

                              Plaintiffs,

              -against-

Moore Capital Management LLC, LM Moore SP
Investments, Ltd., ING Bank Ukraine, ING Bank N.V.
(London, UK branch)

                              Defendants.



Civ.

JAN 12 2009

U.S.D.C. S.D. N.Y.
CASHIERS
JURY TRIAL DEMANDED

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS,
## BREACH OF CONTRACT, AND FRAUDULENT INDUCEMENT

             Plaintiffs Firebird Republics Fund, Ltd., Firebird Global Master Fund II, Ltd.,

and Firebird Avrora Fund, Ltd. (the "Firebird Funds," or, together, "Firebird"), allege the

following upon personal knowledge or upon information and belief:

### INTRODUCTION

             1.     Plaintiffs Firebird Republics Fund, Ltd., Firebird Global Master

Fund II, Ltd., and Firebird Avrora Fund, Ltd. are investment funds focusing primarily on

public and private equity investments in the former Soviet Union, Eastern Europe, and

other emerging markets. On January 12, 2007, each of the Firebird Funds acquired

shares of SV Company Ltd. ("SV") from Defendant LM Moore SP Investments, Ltd.

("LM Moore") for a total purchase price of $9,875,000 (the "Sale"). This action arises

from the misrepresentations (and consequent warranty breaches) perpetrated by LM

Moore and other Defendants acting on its behalf to induce the Firebird Funds to enter into the Sale.

2.      On or about August 17, 2006, Defendant LM Moore and other investors, including Defendant ING Bank N.V. (London, United Kingdom branch) ("ING London"), entered into an agreement with SV and its majority shareholder Andrey Dmitrievich Okhlopkov ("Okhlopkov"), pursuant to which they jointly acquired a substantial investment stake in SV (48%). Individually, LM Moore acquired 34.51% of the equity and ING London acquired 6.76%. Thereafter, both LM Moore and ING London played a substantial role in the oversight of SV's business, securing three seats on SV's Board of Directors (two for LM Moore and one for ING London) with each of their Directors playing an active role in the operation of the company.

3.      Through their representatives at the highest levels of SV and through other inside information in their possession or to which they had ready access, LM Moore, ING London, and the other Defendants subsequently learned, or should have learned, that SV's financial condition was significantly worse than warranted. SV's deteriorating financial condition created a strong incentive for LM Moore to cut its losses and liquidate as much of its initial investment stake as possible.

4.      Consequently, not long after making its investment in SV, LM Moore started to search for potential buyers on whom it could unload its shares. LM Moore approached Firebird's investment management personnel in New York through LM Moore's agent, ING Bank Ukraine ("ING Bank Ukraine"), on December 18, 2006,

2

claiming that it was forced to liquidate a significant portion of its investment in SV due to internal "portfolio concentration issues." LM Moore and ING Bank Ukraine promoted SV to Firebird as a profitable company with significant growth potential in the upcoming year 2007, and supported such assertions by providing purportedly official SV data showing solid gains in 2006 and supposedly close-to-final SV projections that forecasted a healthy increase in sales and earnings in 2007, which was less than two weeks away. To further sway Firebird, the Defendants also provided it a best-case and worst-case scenario for SV's 2007 projections, representing that the 2007 returns would fall somewhere in the range between those two sets of numbers. Alan Freedman of LM Moore also met with Firebird's investment managers in New York in order to further reassure Firebird about investing in SV.

5.      However, there was a catch. LM Moore required Firebird to make up its mind whether to acquire a portion of its SV shares (and execute all necessary agreements) by the end of 2006—less than two weeks from the time LM Moore first approached Firebird. Because Firebird could not complete independent due diligence into SV's financial condition within the timeframe unilaterally imposed by LM Moore, and because SV was a privately traded company with little public information and no public market for its securities, Firebird had to rely on the information supplied by the Defendants when evaluating the transaction. As a result, the analysis and negotiation of the proposed Sale was conducted by Firebird in New York, with no opportunity to visit

3

SV or engage Firebird's own due diligence professionals prior to the closing. The Defendants knew that Firebird was relying exclusively on the information they provided.

6.      Based on the information and assurances provided by the Defendants, Firebird ultimately entered into a transaction with LM Moore to acquire approximately one-fourth of LM Moore's investment in SV. Starting as soon as a month later, Firebird began to learn that SV's financial condition was significantly worse than had been represented by LM Moore and the other Defendants, evidenced by SV's state of almost total collapse just two years later as of today. As a result of their misrepresentations and omissions, Defendants are liable to Firebird for its losses in connection with the SV investment.

## THE PARTIES

7.      Firebird Republics Fund, Ltd. ("Firebird Republics Fund") is an investment fund organized under the laws of the Cayman Islands and managed by Firebird Management LLC, a New York-based investment adviser. Firebird Republics Fund invests primarily in publicly traded equities of companies operating in selected former Soviet republics, including Russia, Kazakhstan, and the Baltics, and early-stage Eastern European markets, including Bulgaria and Romania. On January 12, 2007, Firebird Republics Fund acquired 6,250 shares of SV from Defendant LM Moore for $2,468,750.

8.      Firebird Global Master Fund II, Ltd. ("Firebird Global Master Fund II") is an investment fund organized under the laws of the Cayman Islands and

4

managed by FG2 Advisors, LLC, a New York-based investment adviser. It focuses on public and private equity investments in frontier markets around the world, early stage companies, and out-of-favor industries. On January 12, 2007, Firebird Global Master Fund II acquired 2,500 shares of SV from Defendant LM Moore for $987,500.

9.      Firebird Avrora Fund, Ltd. ("Firebird Avrora Fund") is an investment fund organized under the laws of the Cayman Islands and managed by Firebird Avrora Advisors, LLC, a New York-based investment adviser. Firebird Avrora Fund invests in the markets of the successor states of the Soviet Union and Eastern Europe. On January 12, 2007, Firebird Avrora Fund acquired 16,250 shares of SV from Defendant LM Moore for $6,418,750.

10.     Defendant Moore Capital Management LLC is an investment management firm headquartered in and organized under the laws of New York, and is the managing entity and in charge of day-to-day operations of Defendant LM Moore.

11.     Defendant LM Moore SP Investments, Ltd. ("LM Moore," and together with Defendant Moore Capital Management LLC, the "Moore Defendants") is an investment fund incorporated in the Commonwealth of the Bahamas and operated out of New York.

12.     Defendant ING Bank Ukraine is a Ukrainian corporation with its headquarters in Kyiv, Ukraine.

13.     Defendant ING London (together with ING Bank Ukraine, the "ING Defendants") is the London, United Kingdom division of ING Bank N.V, an

5

Amsterdam. Netherlands corporation, and, being a member of the ING international

banking group, is an affiliate of Defendant ING Bank Ukraine.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 15 U.S.C.

§ 77v and 28 U.S.C. § 1367. Venue is proper under 15 U.S.C. § 77v and 28 U.S.C.

§ 1391(b), (c), and (d) in that Defendants either reside in this District or are aliens, a

substantial part of the events or omissions giving rise to the claim occurred in this

District, and Defendants are subject to personal jurisdiction in this District.

## MOORE'S INVESTMENT IN SV AND
## THE MOORE/SV INVESTMENT AGREEMENT

15.     SV is the legal and beneficial owner of 100% of the issued share

capital of the Soyuz-Victan Group Ltd. ("Soyuz-Victan"), a Ukrainian producer and

marketer of vodka and other alcoholic beverages. At the end of 2006, Soyuz-Victan

claimed that its group of companies was "the third largest vodka producer in the world"

and "the largest spirits producer in the CIS" and that its brand "has been cited as the

fastest growing spirit marquee in the world by Impact Magazine."

16.     On August 17, 2006, LM Moore, ING London, SV, and certain

additional investors entered into an Investment Agreement (the "Investment Agreement")

with Okhlopkov providing for, *inter alia*, their purchase of slightly less than half of SV's

equity (formerly held by an exiting investor). This Investment Agreement was amended

and restated on September 26, 2006. Under the terms of the Investment Agreement, LM

Moore paid $13,413,613.31 and ING London paid $28,586,792.71 in cash for their shares

6

in SV and provided additional consideration to Okhlopkov. In exchange, each received a number of shares allocated according to a formula set forth in the Investment Agreement.

    17.    In the Investment Agreement, SV and Okhlopkov agreed immediately to disclose to LM Moore and ING London "any material breach of any of the Warranties," or "anything occurring which has, or would demonstrably be likely to have after Completion, a material adverse effect on the business of [SV] or any of the Subsidiaries." (Investment Agreement § 3.12.)

### MOORE FLIPS ITS BAD INVESTMENT TO FIREBIRD

    18.    On December 18, 2006, Makar Paseniuk ("Paseniuk"), the Head of Investment Banking at ING Bank Ukraine, contacted Firebird on behalf of LM Moore to discuss an investment opportunity. Paseniuk informed Firebird that LM Moore was forced to liquidate a significant portion of its holdings in SV purportedly "due to portfolio concentration issues," and represented to Firebird that LM Moore would have never chosen to part with the closely held shares of such a valuable consumer goods company were it not for that. Paseniuk offered Firebird the opportunity to acquire approximately $10 million in SV's shares from LM Moore provided that the transaction concluded by the end of that month (i.e., within 12 days and in the midst of the holiday season). Paseniuk claimed that, for internal accounting/risk management reasons, LM Moore had to close the transaction before year-end.

    19.    Although Firebird was interested in discussing a potential transaction, it expressed concern that the time frame LM Moore insisted upon was too

7

short to conduct proper due diligence into SV's financial condition and business outlook. At this point, Paseniuk told Firebird that it could "benefit from" the due diligence LM Moore performed when it made its initial investment in SV in August of 2006, just four months before. Paseniuk stated to Firebird's investment professionals in New York that even without independent due diligence by Firebird, the materials ING Bank Ukraine would supply from LM Moore's due diligence were accurate and sufficient to provide Firebird all the information it needed to evaluate SV's financial condition.

20.      Indeed, on December 28, 2006, ING Bank Ukraine demanded that Firebird pay LM Moore an additional $4 a share for the due diligence it was providing to Firebird, to offset "[l]egal and other transaction costs incurred by original investors." Firebird agreed to do so with the clear understanding that the materials it was paying for were still accurate and complete. Paseniuk further stated to Firebird that LM Moore's short timeframe for the transaction foreclosed the possibility of Firebird conducting its own due diligence prior to entering into the sale.

21.      Based on Paseniuk's representations and LM Moore's purportedly reliable due diligence (which Firebird paid for), and backed by LM Moore's status as a large and presumably reputable New York-based fund, Firebird decided that it would continue to analyze and consider the proposed transaction.

## MOORE'S AND ING'S PHONY DUE DILIGENCE

22.      To facilitate Firebird's review of the transaction, on December 26, 2006, Roman Nikitov ("Nikitov") of ING Bank Ukraine sent Firebird's analysts in New

York a document purporting to contain SV's internal financial projections, made in or around October 2006, for the year 2007 (the "ING Model"). The purpose of providing this information, of course, was to demonstrate to Firebird that SV was in sound financial condition with a positive outlook, thus justifying the purchase price requested by LM Moore. The ING Model purportedly contained SV's projections for its 2007 sales (both yearly and monthly), earnings before interest, taxes, depreciation and amortization ("EBITDA," a commonly-used and important measure of a company's profitability) and other key financial information. Besides such "official" (SV management) projections, the Defendants also provided Firebird's analysts in New York with two other financial scenarios for 2007 in the ING Model—the "upside case" and the "downside case" (i.e., the best- and worst-case scenarios that could reasonably be expected). Understandably, and as is clear from the communications between the parties, the ING Model played a crucial role in Firebird's decision to enter into the Sale.

23.    However, as Firebird would later learn, the ING Model seriously misstated SV's own sales, EBITDA, and other key projections. Not only did SV's actual 2007 performance fall well short of even the worst case scenario projected in the ING Model, but SV's *own projections* were considerably less ambitious than what Nikitov, ING Bank Ukraine, and LM Moore represented them to be. Neither the Moore Defendants nor the ING Defendants disclosed this to Firebird at this time.

24.    On December 21, 2006 Ivan Shvydanenko ("Shvydanenko") of ING Bank Ukraine also provided Firebird's analysts in New York with an Information

9

Memorandum about SV dated October 2006. Just like the ING Model, the Information Memorandum contained, among other things, SV's historical financials (including financial statements of the company's performance during the first half of 2006) and forecasts of SV's net sales, gross profit, EBITDA, and other financial data for 2007. On the Moore Defendants' behalf, the ING Defendants represented to Firebird that the *budgeting information in the Information Memorandum closely approximated SV's official projections for 2007.* Indeed, Shvydanenko's email to Firebird regarding SV's budgeting process for the year 2007 represented that the estimates in the Information Memorandum "serve as a pretty good proxy for the current budgeting process."

## THE COMPLETED SALE

25.     On January 12, 2007, each of the Firebird Funds and LM Moore executed a Share Sale Agreement for the purchase of their respective SV shares (together, the "Share Sale Agreements").

26.     In the Share Sale Agreements, LM Moore warranted to Firebird that SV "has fulfilled and continues to fulfill all of its obligations to [LM Moore] under the investment agreement dated 26 September 2006 made between [SV] and the existing shareholders of [SV] . . . and has not breached any representation, term or condition of the Investment Agreement."

10

## THE TRUTH ABOUT SV

27.     Starting less than a month after the execution of the Share Sale
Agreements, Firebird began to learn that SV's financial condition was significantly and
materially worse than LM Moore and its agents had represented.

28.     Only four weeks after the Sale, Firebird learned that the 2007 sales
projections that it received from ING Bank Ukraine (on LM Moore's behalf) were
markedly different from SV's real numbers. On February 9, 2007, Firebird received an
email from LM Moore that contained a document entitled "Management Report January
2007" (the "SV Report"), comparing SV's actual January 2007 sales with the volume of
such sales projected by SV. In the email, Alan Freedman of LM Moore admitted that
SV's January 2007 results were "very disappointing." However, what proved more
important was that SV's sales projections for the year, as revealed in the SV Report,
differed materially from the projections attributed to SV in the ING Model that was
supplied to Firebird prior to the Sale.

29.     For example, the ING Model falsely represented SV as projecting
436,519 decaliters in Russian sales and 561,000 decaliters in Ukrainian sales in January
2007. In fact, the SV Report revealed that SV had projected 122,593 decaliters in
Russian sales and 387,389 decaliters in Ukrainian sales in January 2007—substantially
less than originally represented to Firebird. (And, of course, SV's actual sales were even
worse than its true projections.)

11

30.     Despite their insider knowledge and three seats on SV's Board of Directors, the Defendants failed to disclose to Firebird that SV's actual sales projections for January were substantially lower than the purported projections given to Firebird earlier. Indeed, the Defendants chose not to supply Firebird the correct data even though the Sale was consummated in the middle of January, when surely the planned January sales numbers would have been available to the Defendants before the start of the month. Furthermore, the appearance of the devastating SV Report as soon thereafter as February 9 strongly suggests that this report and the information therein was available to the Defendants before the Sale, but was kept hidden from Firebird until some time after the transaction closed.

31.     Then, on September 28, 2007, Firebird received an email directly from SV that contained the Consolidated Financial Statements for SV with respect to the first half of 2007 (the "Official 2007 Statistics"), which compared the company's performance during that period to the first half of the prior year, 2006. To Firebird's surprise, the actual SV statistics for the first half of 2006 given in the Official 2007 Statistics were substantially different from those presented by LM Moore and ING Bank Ukraine to Firebird in December 2006 in the Information Memorandum.

32.     Indeed, whereas the Information Memorandum represented that SV's net profit (PAT, or profit after taxes) as of June 30, 2006 was $2,983,000, the Official 2007 Statistics revealed that as of that date SV actually had a net loss of $1,650,000. Similarly, although the ING Model stated that SV's EBITDA at the

12

midpoint of 2006 was $12,129,000, the Official 2007 Statistics showed that in reality it was more than one-third less ($7,850,000). Manifestly, Firebird would never have entered into the Sale had it known SV's true financial condition and the fact that it was actually operating at a loss in 2006.

33.     Firebird also learned that LM Moore and ING Bank Ukraine made materially false representations concerning SV's budgeting process and EBITDA for 2007. For example, Shvydanenko's representation on behalf of the ING Defendants and the Moore Defendants that the estimates in the Information Memorandum "serve as a pretty good proxy for the current budgeting process" turned out to be untrue. In fact, the only "official" 2007 financial statements received by Firebird after the Sale (the Official 2007 Statistics), when projected forward for the remainder of the year, predicted the year-end EBITDA to be $14,630,000. This was less than one fourth of the EBITDA projected in the Information Memorandum and the ING Model—and, judging from its failure to release the final 2007 EBITDA statistics, it can be inferred that SV underperformed even this low projection at the end of 2007.

34.     Moreover, to further interest Firebird in LM Moore's SV shares, in the ING Model the Defendants presented Firebird with two additional sets of projections for 2007 besides the purported "SV management" projection—the "upside case" and the "downside case" for that year. By doing so, ING Bank Ukraine and LM Moore communicated clearly and intentionally to Firebird that the results for the coming year would fall somewhere in between those two projections. The EBITDA in the "upside"

13

scenario was given as $86,501,556 at the end of 2007, whereas in the "downside case" it was $34,503,093. Though Firebird was never supplied with SV's official and final 2007 EBITDA number (despite Firebird's numerous requests for it), Firebird believes, based on the information available, that SV closed 2007 with EBITDA that was about one third or less of the "downside case" represented by the Defendants.

35.    Additionally, the Moore Defendants and the ING Defendants failed to disclose to Firebird that SV was infected with significant supply problems and was reporting false sales data to inflate artificially its December 2006 numbers at the cost of future sales (otherwise known as "channel-stuffing"). In the SV Report, SV recorded that its total sales volume for January 2007 was 32% lower than planned and 46% below the sales volume for the same period during the previous year.

36.    In February 2007, Firebird personnel visited SV and met with SV's Deputy CEO. During this visit, Firebird learned that one primary reason that sales in January 2007 fell so far below what Defendants represented the estimated sales to be was SV's practice of shipping extra products in December 2006 to book better sales before the year-end. Those "channel-stuffing" shipments did not translate into actual sales to end customers and caused distributors to reach their credit limits and SV to stop shipping them additional products in January.

37.    LM Moore and its agents also kept hidden from Firebird serious problems with SV's chain of distribution. In a February 2007 presentation (the "February 2007 Assessment"), three out of five reasons given by SV for its failure to meet January's

14

plan numbers involved the company's inability to supply its liquor to various significant SV distributors/wholesalers. Indeed, with regard to one of the above distributors, the February 2007 Assessment states: "[S]hipments began from 1/16/07 due to Deloitte's audit at our warehouses ([Distributor] was demanding that shipments commence from 1/4/07). Serious assortment undersupply."[1] With regard to another important distributor, the February 2007 Assessment noted: "Auchan [a key hypermarket in Russia]—in January our product was not there. Difficult situation with distributor 'Dilanzh.' Will sue."[2] The Defendants were in the position to know about these issues before the date of the Sale, and had an obligation to inform Firebird of such material supply problems.

38.     SV's current financial condition is not merely a case of falling below sales expectations. The company is in shambles. The shares that LM Moore acquired and quickly passed on to Firebird once it acquired actual or constructive knowledge that SV's financial condition was significantly worse than represented are now essentially worthless. In reaching its current woeful financial condition, SV breached numerous warranties and undertakings in the Investment Agreement. The Defendants should have known about these breaches due to the Investment Agreement's requirement that SV disclose all such breaches to LM Moore and ING London. Even if SV did not comply with this requirement, the Defendants' active involvement in SV's

_____

[1] Translated from Russian.

[2] Translated from Russian.

operations and seats on SV's Board of Directors gave them more than sufficient access to the information that would have revealed SV's breaches. Had the breaches been disclosed to Firebird, Firebird would not have invested in SV and would not have suffered the loss of essentially its entire investment.

## MOORE'S BREACH OF ITS WARRANTY THAT SV IS IN FULL COMPLIANCE WITH THE MOORE/SV INVESTMENT AGREEMENT

39.     At the time the Share Sale Agreements with Firebird were executed, SV was in breach of numerous warranties, conditions, undertakings, and obligations under the Investment Agreement, despite LM Moore's explicit warranty to Firebird to the contrary in the Share Sale Agreements.

40.     For example, since SV was actually operating at a loss in the first half of 2006 (as set forth above), SV was in breach of its warranty in the Investment Agreement that it was operating at a profit from December 31, 2005. Likewise, given that SV admitted at its March 20, 2008 Board of Directors meeting that the company's business plans prior to 2008 were not achievable and unrealistic, SV was also in violation of its warranty that its business plan was "based upon the management's reasonable assessment of the Company's current business position and market share" and other warranties regarding its business plan. Moreover, SV had committed to "carry on and conduct [its] business and affairs in accordance with the Rolling Business Plan and in a prudent and efficient manner." The "channel-stuffing" sales practices set forth above were clearly in breach of this obligation, and also violated SV's warranty in the

16

Investment Agreement as to the reasonable, non-excessive, and salable state of the company's product stock.

41.    Furthermore, though SV was required to reduce its cost of goods sold under the Rolling Business Plan, Firebird learned as early as February 2007 that instead SV had allowed its staff and operating costs to increase substantially. At that time, Okhlopkov stated that "we used to have one floor of employees, now we have three." SV's needless waste and mismanagement were clearly not in line with its commitment in the Investment Agreement to abide by the Rolling Business Plan, adversely affecting SV's business and triggering its obligation to inform the Defendants. This significant expansion in SV's payroll and physical plant could not have gone unnoticed by the Defendants' representatives on SV's Board of Directors. However, at no point before the Sale did either the Moore Defendants or the ING Defendants inform Firebird that SV was in violation of any of their material undertakings in the Investment Agreement.

42.    SV also committed to provide its investors with "monthly sales figures in volume and value terms within 20 Business Days of the end of relevant month." But the materials provided to Firebird prior to the Sale did not include these reports. Either this was another obligation breached by SV despite LM Moore's warranty thereof, or LM Moore withheld such key documentation from Firebird. Notably, SV consistently neglected to provide the required information to Firebird even after Firebird's investment.

17

43.     As noted, in the Investment Agreement SV had committed to disclose to its investors "any material breach of any of the Warranties" and "anything occurring which has, or would demonstrably be likely to have after Completion, a material adverse effect on the business of [SV] or any of the Subsidiaries." Because the Moore Defendants and the ING Defendants had a contractual right under this provision of the Investment Agreement to be informed of adverse information material to SV's business, it can be presumed either (i) that the factors which did indeed have a material adverse effect on SV's business were in fact disclosed to the Moore Defendants and the ING Defendants and withheld from Firebird, and/or (ii) that LM Moore breached its warranty to Firebird in the Share Sale Agreements that SV "has fulfilled and continues to fulfill all of its obligations to Seller under the [I]nvestment [A]greement."

## DEFENDANTS' ATTEMPTS TO HIDE
## SV'S TRUE CONDITION FROM FIREBIRD

44.     LM Moore and ING Bank Ukraine tried to keep the Plaintiffs from finding out SV's real state of affairs both before and after the Sale. Indeed, throughout 2007 the Defendants put off Firebird from obtaining accurate information about SV's finances by withholding vital business data and access to SV's key meetings and decision makers.

45.     To wit, notwithstanding Nikitov's (of ING Bank Ukraine) receipt of SV's paltry Official 2007 Statistics on September 28, 2007, three weeks later Nikitov nevertheless insisted to Firebird that SV's last "downgrade of the budget" projected 2007 EBITDA to be $40 million. Furthermore, the Defendants' assurances prior to the Sale

18

that Firebird would be able to attend and participate in SV's Board of Directors meetings and to obtain regular financial and other important information about the company proved illusory. On September 4, 2007, Paseniuk (of ING Bank Ukraine) claimed that one of LM Moore's Directors, Robert Sasson, was the "person de facto responsible for [Investor Relations] at the Company. Robert gets [SV's] operating info on a regular basis unlike us who get it on a request basis usually." Despite that, Firebird's repeated requests to LM Moore and ING Bank Ukraine for up-to-date information on SV's financial status and outlook and numerous complaints to the Defendants met with no response of any substance after the Sale. In fact, none of the Defendants revealed SV's true condition to Firebird until as late as 2008.

46.     Defendants knew or should have known that representations they made to Firebird regarding SV were either materially misleading or omitted to state facts necessary to make the representations, under the circumstances in which they were made, not misleading.

47.     Indeed, three days before the execution of the Share Sale Agreements, Paseniuk unequivocally represented to Firebird that the Moore Defendants carefully followed SV's operations and financial condition, including through having two representatives on SV's Board of Directors. Paseniuk wrote:

> Investors are represented by — Alan Freedman, Moore Capital, Senior PE Portfolio Manager; Robert Sasson — Moore Capital, CIS Representative . . . , Mathew Hancox — ING, Managing Director CEE Corporate Finance.

19

> The Board meets on a regular basis and is actively involved in
> decision making processes. Robert Sasson, who is based in
> Moscow/St. Petes is charged with day-to-day responsibility to
> work with [SV] on putting in place formal corporate governance
> procedures, IR functions, financial reporting, liaison with
> international financial institutions, etc. Active participation of
> board members was one of the pre-conditions for the
> investments on the part of Andrey Ohlopkov [*sic*]. All three
> individuals travel a lot in Russian/Ukraine and are capable of
> having regular meetings and staying fully plugged into the
> company.

Through these representatives on the Board of Directors and their "active[]"

involve[ment]" and "day-to-day" oversight of SV, including Sasson's virtually unfettered

access to SV's "operating info on a regular basis," the Moore Defendants and the ING

Defendants either knew or had access to information and facts that would have

established that their representations to Firebird were not accurate.

      48.    SV's current financial state and its future prospects are quite bleak.

Despite promises of growth and improving returns at the time Firebird invested, SV's

own 2008 budget forecast its key profitability statistic (EBITDA) for the year to be only

$13,000,000, or only 32% of its EBITDA for 2006. (Notably, during the vast majority of

that 2006-2008 time period, both the liquor and the equities markets in Russia and

Ukraine, as well as most of SV's competitors, experienced solid growth.) What is worse,

SV must now devote almost all of its efforts toward restructuring its massive debt of over

$220,000,000 (or, over 16 times its yearly EBITDA), $70 million of which is due to be

repaid before or during March 2009. Currently, SV uses its small cash flow to barely

cover periodic interest payments on its debt, and can pay out almost none of the principal

on such debt. SV has been trying to reduce its debt burden by spinning off one of its subsidiaries and selling close to all of its non-core real estate (and other) assets, but the present decline of all the emerging markets makes that exceedingly difficult (and likely insufficient to solve the high leverage problem). While SV seeks to renegotiate and extend many of its loans, the worldwide financial situation has made the prospect of that even more difficult than it would be otherwise. As a result of the above, Firebird's interest in SV cannot be sold for anything close to the Share Sale Agreements' purchase price, and is next to worthless in today's market.

## COUNT I

### CLAIM BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS FOR VIOLATION OF § 10(B) OF THE SECURITIES EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

49.     Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 to 48 above as if fully set forth herein.

50.     This Count is brought pursuant to § 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, against all Defendants.

51.     Defendants made material misrepresentations and/or omissions, with scienter, in connection with Firebird's purchase of the SV securities from LM Moore, on which Firebird relied and as a result of which Firebird suffered damages.

21

52.    Defendants acted with scienter in that there is strong circumstantial evidence of conscious misbehavior or recklessness and that Defendants had both motive and opportunity co commit fraud. As set forth above, each Defendant knew facts or had access to information, such as SV's real 2006 financials, the SV Report containing SV's actual 2007 sales projections or other information acquired through their agents on SV's Board of Directors, suggesting that their representations to Firebird were not accurate. Additionally, the Moore Defendants' professed need to comply with the funding limits of their investment portfolio, and the consequences of failing to do so, provided them with a strong motive to make the misrepresentations and omissions necessary to rapidly offload a large portion of LM Moore's holdings, assuming the Moore Defendants' representations regarding their reasons for the sale were even true. If the Moore Defendants lied about their reasons for the sale, such a deliberate misstatement made with knowledge of its falsity by itself constitutes strong evidence of conscious misbehavior.

53.    Defendants' misrepresentations and omissions were in connection with a purchase or sale of securities, specifically, Firebird's purchase of a total of 25,000 shares of SV from LM Moore.

54.    Plaintiffs relied on Defendants' misrepresentations or omissions in entering into the Share Sale Agreements with LM Moore. But for Defendants' misrepresentations or omissions, Firebird would not have purchased the securities.

55.    As a result of the material misrepresentations made by Defendants in connection with Firebird's purchases of SV securities, Plaintiffs suffered economic

loss. Once the truth about SV's financial condition and its breach of the warranties, conditions, and undertakings in the initial Investment Agreement came to light, Firebird's shares in SV lost substantially all of their value.

56.     The Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves, or a person whom they controlled, employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or engaged in acts, practices and a course of conduct that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of the SV securities.

## COUNT II

### CLAIM BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS FOR FRAUDULENT INDUCEMENT

57.     Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 to 56 above as if fully set forth herein.

58.     Defendants, acting on behalf of LM Moore, made material misrepresentations, with scienter, on which Firebird justifiably relied to its detriment.

59.     As a result of Defendants' fraudulent inducement, Defendants are liable for the harm caused by Firebird's justifiable reliance on Defendants' misrepresentations.

23

## COUNT III

### CLAIM BY ALL PLAINTIFFS AGAINST LM MOORE
### FOR BREACH OF CONTRACT

60.    Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 to 59 above as if fully set forth herein.

61.    Valid contracts in the form of the Share Sale Agreements existed between (i) LM Moore and the Firebird Republics Fund, (ii) LM Moore and the Firebird Global Master Fund II, and (iii) LM Moore and the Firebird Avrora Fund.

62.    Each of the Firebird Funds furnished valid consideration for the benefits given to them under the Share Sale Agreements by agreeing to furnish to LM Moore the purchase prices provided for in the Share Sale Agreements.

63.    Each of the Firebird Funds performed all of their obligations under the Share Sale Agreements in that they delivered to LM Moore cleared funds representing the agreed purchase prices to LM Moore's bank account as specified in the Share Sale Agreements immediately after their execution.

64.    LM Moore breached each of the Share Sale Agreements. Specifically, LM Moore warranted to the Firebird Funds that SV "has fulfilled and continues to fulfill all of its obligations to [LM Moore] under the investment agreement dated 26 September 2006 . . . and has not breached any representation, term or condition of the Investment Agreement." In fact, SV had not fulfilled such obligations, representations, terms, and conditions in the Investment Agreement. Specifically, Sections 3.12, 7.1(a), 7.1(d), and 7.2 of the Investment Agreement and Paragraphs 1, 2.1,

2.2, 2.3, 4.1, 4.10, 9.2 and 9.4 of Schedule 6 to the Investment Agreement, which LM

Moore warranted, were not satisfied at the time the Share Sale Agreements were

executed. As a result, LM Moore is in breach of its warranty in the Share Sale

Agreements.

      65.    LM Moore also breached the covenants it made to each of the

Firebird Funds in the Share Sale Agreements, in which LM Moore promised the

following:

> The Seller undertakes to the Purchaser that the Seller shall (as
> quickly as possible following Completion [i.e., "immediately
> after the execution of this Agreement"] procure that the directors
> of the Company shall hold a board meeting (or take other
> equivalent action, such as the adoption of written resolutions) in
> which they will vote in favour of the registration of the Purchaser
> as holder of the Shares subject to the production in due course of
> a completed transfer in respect of the Shares and will direct the
> secretary of the Company to issue the Purchaser with a new share
> certificate in respect of the Shares.

*   *   *

> The Seller agrees that if, within 15 days of the execution of this
> Agreement, (i) the directors do not vote and take all other action
> as described [above], or (ii) the Purchaser is not registered as
> holder of the Shares, the Seller shall return in cleared funds the
> [purchase] Price to the Purchaser.

In fact, LM Moore violated these covenants. As late as May 12, 2008, Firebird had not

received the share certificates LM Moore had covenanted to provide, and wrote LM

Moore to inform it that "[d]espite numerous requests from Firebird, [SV] has failed to

provide it with evidence that Firebird is the registered holder of the shares purchased

under the [Share Sale] Agreements." LM Moore responded by providing what purported

25

to he copies of the share certificates in the name of the Firebird Funds. These materials, sent by counsel to LM Moore on June 4, 2008, were not issued to the Firebird Funds (as the purchasers) within 15 days of the January 12, 2007 purchase, as covenanted by LM Moore. Additionally, the share certificates provided by LM Moore were dated January 11, 2007, a day *before* the completion of the purchases rather than "following Completion" as required. Notably, in the Share Sale Agreements the clearly set forth consequence for such a breach by LM Moore of its contractual obligations is a rescission of the entire purchase transaction.

      66.    As a result of LM Moore's breaches, each of the Firebird Funds suffered damages.

26

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. Declaring and determining that Defendants violated the federal securities laws and the applicable common law by reason of their conduct as alleged herein;

2. Awarding Plaintiffs compensatory and punitive damages against Defendants, and/or rescissory damages and any other applicable equitable remedies, jointly and severally, in an amount to be determined at trial, together with prejudgment and postjudgment interest at the maximum rate allowed by law;

3. Awarding Plaintiffs their costs and disbursements, including the fees of Plaintiffs' counsel and experts, and reimbursement of expenses; and

4. Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:     New York, New York
           January 12, 2009

CHADBOURNE & PARKE LLP

By

Scott S. Balber
A Member of the Firm
Attorneys for Firebird Republics Fund,
Ltd., Firebird Global Master Fund II,
Ltd., Firebird Avrora Fund, Ltd.
30 Rockefeller Plaza
New York, New York  10112
(212) 408-5100

27